**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Michael BLOOM, Defendant–Appellant.**

**No. 91–2225.**

United States Court of Appeals,
Tenth Circuit.

Sept. 21, 1992.

Joseph Saint–Veltri, Denver, Colo., for defendant-appellant.

David Williams, Asst. U.S. Atty. (Don J. Svet, U.S. Atty., Thomas L. English, Asst. U.S. Atty. with him on the brief), Albuquerque, N.M., for plaintiff-appellee.

Before BALDOCK, SETH and KELLY, Circuit Judges.

BALDOCK, Circuit Judge.

Defendant-appellant Michael Paul Bloom entered a conditional guilty plea, Fed. R.Crim.P. 11(a)(2), to possession with intent to distribute less than fifty kilograms of marijuana. 21 U.S.C. §§ 841(a)(1), 841(b)(1)(D). Defendant appeals the district court's denial of his motion to suppress evidence allegedly seized in violation of the Fourth Amendment and the denial of his request for a downward departure from his guidelines sentence. *See* U.S.S.G. § 5K2.0. Our jurisdiction over the Fourth Amendment issue arises under 28 U.S.C. § 1291. Because our resolution of this issue will permit Defendant to withdraw his guilty plea, Fed.R.Crim.P. 11(a)(2), we do not address the sentencing issue.

I.

On the afternoon of March 6, 1991, Drug Enforcement Administration Special Agent Kevin Small and United States Border Patrol Agent Hector Ochoa conducted a routine check of a passenger train originating in Los Angeles, California, en route to Chicago, Illinois, during its scheduled stop in Albuquerque, New Mexico.[1] Agent Ochoa was in uniform and visibly armed while Agent Small was in plain clothes with his weapon concealed in a "fanny pack." Agent Ochoa overheard Defendant asking an attendant the purpose of Agent Ochoa's presence. Defendant appeared to Agent Ochoa to be "very nervous" and "some-

---

1. Federal law enforcement authorities board the train daily during its scheduled stop in Albuquerque to look for narcotics traffickers and illegal aliens.

what excited." Agent Ochoa also saw two large suitcases in Defendant's private compartment.[2] Agent Ochoa conveyed this information to Agent Small. The agents walked by Defendant's compartment and looked through the window, observing the two suitcases. According to Agent Small, the suitcases were "Delci" type, a high quality brand with an airtight seal, commonly used by persons transporting narcotics. Defendant was not in the compartment. The agents left the train and stood on the platform.

Following the announcement for passengers to reboard the train, the agents returned to Defendant's compartment. Agent Small knocked on the door while Agent Ochoa stood in the unoccupied adjacent compartment out of sight. When Defendant answered the door, Agent Small identified himself with his DEA credentials and badge and asked to speak with him. Defendant agreed, and Agent Small, while standing in the hallway to the side of the door, questioned him. In response, Defendant stated that he lived in Arizona; he boarded the train in Flagstaff, Arizona; he was en route to New York City; and he was traveling alone. According to Agent Small, Arizona is an origination point for marijuana, and New York City is a major distribution point. At Agent Small's request, Defendant showed him his ticket and Arizona driver's license which confirmed the information provided by Defendant. The ticket also indicated that it was one-way and had been purchased for $679 in cash two days earlier. At some point during the questioning, Agent Ochoa stepped out of the adjacent room and questioned Defendant about his city of residence.

Agent Small told Defendant that the DEA "had a problem on board the train of people traveling alone like he was, out of Arizona, traveling back east, carrying drugs in their luggage." In response to a direct question by Agent Small, Defendant stated that he did not have drugs in his luggage. Agent Small asked Defendant if he would voluntarily consent to a search of his luggage to verify that he was not carrying drugs. Defendant declined to permit Agent Small to search his luggage stating that his mother's remains, which he was taking back to New York for burial, were inside. The entire encounter lasted seven to ten minutes, and the agents then left the train.

Agent Small subsequently questioned the train attendant. The attendant confirmed that Defendant had boarded the train in Flagstaff, and that Defendant had told him to be very careful with his luggage because his mother's remains were inside. Agent Small then went to the ticket office and requested Defendant's travel history which also corroborated Defendant's statement that he was traveling with his mother's remains.

The agents returned to Defendant's compartment, and Agent Small knocked on the open door while Agent Ochoa again stood in the adjacent room out of sight. Agent Small again showed Defendant his badge and asked to speak with him. Defendant walked to the door and agreed. Agent Small said that he just wanted to make sure that he understood that Defendant was traveling with his mother's remains back to New York City. Defendant indicated that was not what he said. Defendant stated that he was traveling back to New York City to take care of his mother's remains. Agent Small seized the two suitcases over Defendant's objection. Agent Small took the luggage to the depot and immediately subjected it to a canine sniff which alerted to the presence of contraband. Agent Small returned to Defendant's compartment and arrested Defendant. After obtaining a warrant, a search of the luggage uncovered marijuana.

## II.

Defendant argued in the court below, and continues to argue on appeal, that Agent Small's seizure of his luggage violat-

---

**2.** The compartment was approximately six feet wide and ten to twelve feet in length with a sofa on one side and approximately three feet of aisle space inside. The compartment also had a small bathroom, and an upper berth where Defendant had stored the suitcases. The compartment, known as a "deluxe sleeper," is designed to accommodate two people.

ed the Fourth Amendment because Agent Small lacked a reasonable suspicion that the luggage contained contraband. The district court rejected Defendant's argument, holding that Defendant's change of story concerning his mother's remains combined with the circumstances of the cash ticket and Defendant traveling from Flagstaff to New York gave Agent Small a reasonable suspicion to seize the luggage. *See United States v. Place*, 462 U.S. 696, 706, 103 S.Ct. 2637, 2644, 77 L.Ed.2d 110 (1983) (officer whose "observations lead him reasonably to believe that a traveler is carrying luggage that contains narcotics ... [may] detain the luggage briefly to investigate the circumstances that aroused his suspicion").

After Defendant filed his brief in this Court, we held that an encounter between two law enforcement officers and a person in a private train compartment constituted an investigative detention when the officers asked incriminating questions and failed to advise the person of his right to terminate the encounter. *United States v. Ward*, 961 F.2d 1526, 1531–34 (10th Cir. 1992). Defendant has since supplemented his brief by citing *Ward* to support his contention that the district court erred in denying his suppression motion. If Defendant was seized in violation of the Fourth Amendment prior to giving the statements upon which the district court relied in finding reasonable suspicion to seize the luggage, the statements would be the tainted fruit of an unlawful seizure and therefore could not be considered in determining the reasonableness of Agent Small's subsequent seizure of the luggage. *See id.* at 1530 (reasonable suspicion resulting from defendant's untruthful answers proper only if questioning of defendant was voluntary, consensual encounter); *United States v. Santillanes*, 848 F.2d 1103, 1108 (10th Cir.1988) (statement made by defendant during illegal detention could not be considered in determining reasonable suspicion for further detention). *See also Florida v. Royer*, 460 U.S. 491, 507–08, 103 S.Ct. 1319, 1329–30, 75 L.Ed.2d 229 (1983) (plurality opinion) (defendant's consent to search luggage tainted by illegal detention and there-

fore ineffective to justify search). Accordingly, we initially address the *Ward* issue and find it to be dispositive of Defendant's appeal.

## III.

▮ In denying Defendant's suppression motion, the district court concluded that Defendant was not seized during either encounter prior to his arrest and that he voluntarily provided the information requested by Agent Small. While we review the district court's factual finding of whether Defendant was seized under the clearly erroneous standard, *United States v. Werking*, 915 F.2d 1404, 1409 (10th Cir. 1990), "the ultimate issue of whether a seizure occurred is a question of law." *United States v. Ward*, 961 F.2d 1526, 1534 (10th Cir.1992) (citations omitted). Here, the facts are undisputed; accordingly, our review is de novo. *See United States v. Jordan*, 958 F.2d 1085, 1086 (D.C.Cir.1992); *United States v. McKines*, 933 F.2d 1412, 1426 (8th Cir.) (en banc), *cert. denied*, —— U.S. ——, 112 S.Ct. 593, 116 L.Ed.2d 617 (1991); *United States v. Montilla*, 928 F.2d 583, 588 (2d Cir.1991). *But see United States v. Silva*, 957 F.2d 157, 158 (5th Cir.), *petition for cert. filed*, No. 92–5259 (U.S. July 21, 1992); *United States v. Wilson*, 895 F.2d 168, 171 (4th Cir.1990); *United States v. Rose*, 889 F.2d 1490, 1495 (6th Cir.1989); *United States v. Teslim*, 869 F.2d 316, 321 (7th Cir.1989).

▮ The Supreme Court has delineated three types of police-citizen encounters: (1) consensual encounters which do not implicate the Fourth Amendment, *see, e.g., Michigan v. Chesternut*, 486 U.S. 567, 574–76, 108 S.Ct. 1975, 1979–81, 100 L.Ed.2d 565 (1988); *INS v. Delgado*, 466 U.S. 210, 218–21, 104 S.Ct. 1758, 1763–65, 80 L.Ed.2d 247 (1984); (2) investigative detentions which are Fourth Amendment seizures of limited scope and duration and must be supported by a reasonable suspicion of criminal activity, *see, e.g., United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989); *Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868, 1884–85, 20 L.Ed.2d 889 (1968); and (3) arrests, the most intrusive of Fourth Amendment sei-

zures and reasonable only if supported by probable cause. *See, e.g., Hayes v. Florida,* 470 U.S. 811, 815–16, 105 S.Ct. 1643, 1646, 84 L.Ed.2d 705 (1985); *Dunaway v. New York,* 442 U.S. 200, 212–16, 99 S.Ct. 2248, 2256, 60 L.Ed.2d 824 (1979). At issue in the case before us is whether the encounter between Defendant and the agents at the door to his train compartment was a consensual encounter or an investigative detention.

In *Florida v. Bostick,* — U.S. —, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991), the Supreme Court set forth the governing standard for determining whether a police-citizen encounter implicates the Fourth Amendment:

> [I]n order to determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the *police conduct* would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter.

*Id.* — U.S. at —, 111 S.Ct. at 2389 (emphasis added). *Bostick* gives us little guidance in applying its standard because the Court declined to determine whether a

seizure occurred and remanded to the Florida Supreme Court for a determination under the proper standard.[3] *Id.* — U.S. at —, 111 S.Ct. at 2388. Clearly, an officer's physical restraint of a person is a seizure. *See Terry,* 392 U.S. at 19, 88 S.Ct. at 1878–79 (officer seized defendant when he took hold of him, spun him around, and patted down outer surfaces of his clothing). The closer cases, like the one before us, involve no physical restraint, and we must determine whether the police conduct, in light of the surrounding circumstances, would communicate to a reasonable person that he or she was not free to decline the officer's request or otherwise terminate the encounter.

■ "[A] seizure does not occur simply because a police officer approaches an individual and asks a few questions." *Bostick,* — U.S. at —, 111 S.Ct. at 2386. *See also Florida v. Rodriguez,* 469 U.S. 1, 5–6, 105 S.Ct. 308, 311, 83 L.Ed.2d 165 (1984) (per curiam). While the Court has suggested that "when ... officers detain[ ] [a person] for the purpose of requiring him to identify himself, they perform[ ] a seizure of his person subject to the requirements of the Fourth Amendment," *Brown v. Texas,*[4] 443 U.S. 47, 50, 99 S.Ct. 2637, 2640, 61

---

**3.** *Bostick* addressed the police practice of randomly boarding buses and questioning passengers for whom the police lacked a reasonable suspicion of criminal activity. The Florida Supreme Court had relied on the United States Supreme Court's earlier statement that "a seizure occurs when a reasonable person would believe that he or she is not 'free to leave,'" *see Chesternut,* 486 U.S. at 573, 108 S.Ct. at 1979, and found that random questioning of bus passengers by police officers was a per se Fourth Amendment violation. *Bostick,* — U.S. at —, 111 S.Ct. at 2386–87. In rejecting Florida's per se rule, the *Bostick* Court found the "free to leave" analysis inapplicable in the confines of a bus because "a passenger on a bus that was scheduled to depart ... would not have felt free to leave the bus even if the police had not been present." *Id.* — U.S. at —, 111 S.Ct. at 2387. The *Bostick* Court reasoned that police-citizen encounters on a bus were akin to encounters in the workplace; in both settings, the person may not feel free to leave, but their restriction is not necessarily due to the police conduct. *Id.* (citing *Delgado,* 466 U.S. at 218, 104 S.Ct. at 1763–64). Accordingly, the Court refined the inquiry to "whether a reasonable person would feel free to decline the officers' requests or otherwise

terminate the encounter," noting that this test "applies equally to police encounters that take place on trains, planes, and city streets." *Id.* — U.S. at —, 111 S.Ct. at 2387–88.

**4.** In *Brown,* two officers observed the defendant and another man walking away from each other in an alley. 443 U.S. at 48, 99 S.Ct. at 2639. The officers approached the defendant and asked him to identify himself and explain what he was doing there. *Id.* at 48–49, 99 S.Ct. at 2639–40. When the defendant refused to identify himself, the other officer frisked him, and the defendant was arrested for failing to identify himself. *Id.* at 49, 99 S.Ct. at 2639–40. While the Court's holding indicates that the defendant was seized at the point the officers asked him for identification and nothing in *Brown* indicates that the officers applied any physical restraint until the point they frisked the defendant after he refused to supply identification, *see id.* at 50, 99 S.Ct. at 2640, the Supreme Court subsequently characterized the *Brown's* holding as a physical detention of the defendant. *See Delgado,* 466 U.S. at 216, 104 S.Ct. at 1762–63. Nonetheless, *Brown's* precedential value is limited because it preceded the objective "free to leave" standard first recognized in *United States v.*

L.Ed.2d 357 (1979), more recent Supreme Court authority dispels any notion that merely approaching a person in a public place and asking him to identify himself implicates the Fourth Amendment. *See Delgado*, 466 U.S. at 216, 104 S.Ct. at 1762–63. Nor does an officer's request for consent to search a person's luggage turn an otherwise consensual encounter into an investigative detention "as long as the officers do not convey a message that compliance with their request is required." *Bostick*, —— U.S. at ——, 111 S.Ct. at 2386 (citations omitted). The Supreme Court decisions prior to *Bostick* suggest that the officers' conduct must give the person "an objective reason to believe that he was not free to end his conversation with the law enforcement official" in order to rise to the level of a Fourth Amendment seizure. *Werking*, 915 F.2d at 1408.

For example, in *Delgado*, the Court addressed the INS practice of entering into a factory and systematically questioning workers regarding their immigration status. Several armed INS agents, displaying their badges would position themselves by the doors to the factory while others would approach individual employees and ask them questions regarding their citizenship without indicating that they were free to leave. 466 U.S. at 212, 217, 104 S.Ct. at 1760, 1763. If the agents were not satisfied with the individual's answer, they would ask the employee to produce his or her immigration papers. *Id.* at 212–13, 104 S.Ct. at 1760–61. Notwithstanding the obvious intimidating effect of armed agents positioned at the doors while other agents questioned persons and requested identification, the Court characterized the encounters as "classic consensual encounters rather than Fourth Amendment seizures." *Id.*

at 221, 104 S.Ct. at 1765. *See also Chesternut*, 486 U.S. at 574–76, 108 S.Ct. at 1979–81 (Officers did not seize the defendant whom they observed running down the street when they accelerated to catch up with him and drove alongside him for a short distance in a marked police car.).

By contrast, in *Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983), a majority of the Court found a seizure when two plainclothes detectives approached the defendant in an airport concourse, requested to see his ticket and identification, identified themselves as narcotics officers, indicated that they suspected him of transporting narcotics, and asked him to accompany them to a nearby room while retaining his ticket and identification without indicating that he was free to depart. *Id.* at 501–02, 103 S.Ct. at 1326–27 (plurality opinion); *id.* at 511–12, 103 S.Ct. at 1331–32 (Brennan, J., concurring).[5] Critical to the Plurality's holding was the officers' retention of the defendant's identification and ticket because "as a practical matter, [the defendant] could not leave the airport without them." *Id.* at 503 n. 3, 103 S.Ct. at 1327 n. 3 (plurality opinion). *See also Werking*, 915 F.2d at 1408 (seizure in *Royer* due to agents' retention of defendant's driver's license and ticket). *Accord Jordan*, 958 F.2d at 1087 (similarly construing *Royer*). A comparison of *Delgado* and *Royer* suggests that the police conduct must present some objective barrier, although not necessarily a physical restraint, to terminating the encounter in order to implicate the Fourth Amendment.

■ Having examined the Supreme Court's consideration of this issue, we turn our attention to *Ward* in which we "test[ed] the limits of *Bostick* in an encoun-

---

*Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (opinion of Stewart, J.), and not adopted by a majority of the Court until *Florida v. Royer*, 460 U.S. 491, 502, 103 S.Ct. 1319, 1326–27, 75 L.Ed.2d 229 (1983) (plurality opinion); *id.* at 511–12, 103 S.Ct. at 1331–32 (Brennan, J., concurring); *id.* at 514, 103 S.Ct. at 1333 (Blackmun, J., dissenting).

**5.** Although Justice Brennan indicated that he would find a seizure "once an officer has identi-

fied himself and asked a traveler for identification and his airline ticket," *Royer*, 460 U.S. at 511, 103 S.Ct. at 1331 (Brennan, J., concurring), the Plurality stated that "asking for and examining [the defendant's] ticket and his driver's license were no doubt permissible in themselves," and carefully delimited the point of the seizure when the officers requested the defendant to accompanying them to their office while retaining his ticket. *Id.* at 501, 103 S.Ct. at 1326 (plurality opinion).

ter in a small private compartment of a train." 961 F.2d at 1528. In *Ward,* two officers, displaying their badges, approached the defendant who was in a private train compartment. *Id.* at 1530. One of the officers leaned inside the compartment and received permission from the defendant to enter. *Id.* The officer sat down between the defendant and the door. *Id.* After questioning the defendant concerning his luggage and identification, the officer began asking "focused, potentially incriminating questions." *Id.* at 1532. "The officers did not touch or physically restrain [the] defendant; they were in plain clothes; their weapons were not displayed . . .; and the officers used a regular tone of voice." *Id.* at 1533. Nonetheless, we held that the officers seized the defendant "specifically at the time when, without informing [the] defendant of his right to terminate the encounter, the detective first began to ask [the] defendant potentially incriminating questions." *Id.* at 1534.

Like the officers in *Ward,* the agents in the present case did not touch or physically restrain Defendant and they used a regular tone of voice. However, several factors, which supported our holding in *Ward* that the officers seized the defendant, are present in the case before us. A review of these factors leads us to conclude that this case is materially indistinguishable from *Ward,* and we are therefore required to follow it. *See United States v. Spedalieri,* 910 F.2d 707, 710 n. 3 (10th Cir.1990) (three-judge panel cannot overrule Circuit precedent).

In *Ward,* the location of the encounter in the confines of a small private train compartment weighed heavily in our analysis.[6] *See* 961 F.2d at 1531. *See also Chesternut,* 486 U.S. at 573, 108 S.Ct. at 1979 ("[W]hat constitutes a restraint on liberty prompting a person to conclude that he is not free to 'leave' will vary, not only with the particular police conduct at issue, but also with the setting in which the conduct occurs."). *Cf. Bostick,* — U.S. at —, 111 S.Ct. at 2389 ("The cramped confines of a bus are one relevant factor that should be considered in evaluating whether a passenger's consent is voluntary."). Like *Ward,* Defendant in the present case was alone in the confines of a private train compartment. Although Defendant's compartment was somewhat larger than the compartment in *Ward,* it was still a relatively confined space. Moreover, the officer in *Ward* was inside the compartment with the defendant (albeit with the defendant's permission) and sat between the defendant and the door to the compartment, 961 F.2d at 1530, whereas Agent Small did not enter the compartment until he seized Defendant's luggage, and did not block the door. However, the critical factor about the location of the encounter is its nonpublic nature. *See Ward,* 961 F.2d at 1531. *See also United States v. Ray,* 973 F.2d 840, 842-43 (10th Cir.1992) ("A decisive factor in *Ward* was the defendant was not in a public place or in view of persons other than law enforcement personnel."). "[A] reasonable innocent person who is alone when approached by law enforcement officers is more likely to feel that he or she was the specific object of the officers' inquiry." *Ward,* 961 F.2d at 1532. While the nonpublic setting is not dispositive, by approaching Defendant in the confines of his private train compartment, the agents' conduct would likely communicate to a reasonable person that he was unable to decline the agents' request or otherwise terminate the encounter.[7] *Id.* at 1531-32.

---

**6.** We recognized that a person traveling in a private train compartment "has a higher expectation of privacy than an individual traveling in a public passenger car of the train," *Ward,* 961 F.2d at 1531–32 (citations omitted), and that "the officers' confrontation of defendant in a place where he had a legitimate expectation of privacy support[ed] the conclusion that the encounter occurred in a private, nonpublic setting—as distinguished from an open, public setting." *Id.* at 1532. While a person's "higher expectation of privacy" in his or her train compartment would have some relevance if we were reviewing a search of the compartment, it has limited relevance to the question of whether a reasonable person would believe that he or she is unable to terminate the encounter.

**7.** The Supreme Court has never considered the impact of a private setting on whether a police-citizen encounter rises to the level of an investigative detention. However, as we noted in

*See also Royer,* 460 U.S. at 502–03, 103 S.Ct. at 1327–28 (plurality opinion) (removing person from public place to private room where he was alone with officers supported finding that encounter was no longer consensual). *But see United States v. Tavolacci,* 895 F.2d 1423, 1424–26 (D.C.Cir.1990) (encounter between officers and defendant at door to private train compartment was not a seizure).

In addition to the nonpublic setting, particular aspects of the officers' conduct in *Ward,* which supported our conclusion that the defendant was seized, are also present in this case. First, the presence of two agents "increase[d] the coerciveness of [the] encounter." *Ward,* 961 F.2d at 1533 (citation omitted). Although Agent Ochoa initially remained out of sight, he emerged from the adjacent room and joined the interrogation after Defendant indicated where he lived. Thus, like *Ward,* Defendant was outnumbered, and he knew it. Moreover, unlike both officers in *Ward,* Agent Ochoa was in uniform and visibly armed, and this factor tends to support an objectively reasonable belief that Defendant was unable to terminate the encounter.

More importantly, the officers in *Ward* asked the defendant "focused, potentially incriminating questions" which would "heighten" the feeling that the person "was the specific object of the officers' inquiry," and lead a reasonable person to believe that he or she was less able to terminate the encounter. *Id.* at 1532. *See also United States v. White,* 890 F.2d 1413, 1416 (8th Cir.1989) (officer's statement that defendant exhibited characteristics of drug trafficker could lead defendant to reasonably believe that he was particular focus of narcotics investigation and not free to leave), *cert. denied,* —— U.S. ——, 111 S.Ct. 77, 112 L.Ed.2d 50 (1990); *United States v. Savage,* 889 F.2d 1113, 1115, 1117 (D.C.Cir. 1989) (encounter in train roomette became seizure when officers' questions became "direct and probably forceful"); *United States v. Nunley,* 873 F.2d 182, 184–85 (8th

Cir.1989) (consensual encounter became seizure when officer explained that his purpose was to stop the flow of drugs through the airport); *United States v. Gonzales,* 842 F.2d 748, 752 (5th Cir.1988) (defendant was seized when officer stated that he was "working narcotics" and requested to look in her bag), *overruled on other grounds by United States v. Hurtado,* 905 F.2d 74 (5th Cir.1990) (en banc); *United States v. Borys,* 766 F.2d 304, 311 (7th Cir.1985) (consensual questioning ripened into investigative stop when agents explained that they suspected defendant of transporting drugs), *cert. denied,* 474 U.S. 1082, 106 S.Ct. 852, 88 L.Ed.2d 893 (1986); *United States v. Berry,* 670 F.2d 583, 597 (5th Cir.1982) (en banc) (officer's intimation that investigation had focused on individual could induce reasonable person to believe that failure to cooperate would lead to formal detention). *But see McKines,* 933 F.2d at 1418 (informing defendant that he is focus of narcotics investigation does not predict a seizure); *Wilson,* 895 F.2d at 170–71 (defendant was not seized when approached in airport terminal by officer who requested identification and asked whether he was carrying drugs). In the present case, Agent Small informed Defendant that he was on the train to interdict drug traffickers and directly asked Defendant whether he was carrying any drugs. While "police questioning, by itself, is unlikely to result in a Fourth Amendment violation," *Delgado,* 466 U.S. at 216, 104 S.Ct. at 1762–63, Agent Small's directly incriminating questions in a nonpublic setting would tend to communicate to a reasonable person that, as the specific target of the agents' investigation, he was unable to terminate the encounter.

Finally, we noted in *Ward* that the officers never advised the defendant that he was free to decline their requests or otherwise terminate the encounter. 961 F.2d at 1533. The Supreme Court has recognized that the failure to give such an advisement does not necessarily eliminate the consen-

Ward, several Supreme Court cases addressing the issue have recognized the public nature of the setting, and these cases as well as "common sense" "make clear that whether the encounter occurs in the public view is particularly significant." 961 F.2d at 1531 (cases cited therein).

sual nature of the encounter.[8] *See Delgado,* 466 U.S. at 216, 104 S.Ct. at 1762–63 ("While most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response."). Nonetheless, we afforded this factor "greater weight" in *Ward* because the encounter occurred in a nonpublic setting, 961 F.2d at 1533, thus emphasizing our concern over police-citizen encounters in nonpublic settings when the

citizen is informed that he or she is the specific object of a criminal investigation. Like *Ward,* the agents in the present case never advised Defendant that he could decline their request or otherwise terminate the encounter.[9]

What began as a consensual encounter became an investigative detention when Agents Small and Ochoa questioned Defendant about whether he was transporting narcotics while he was confined in a private

---

**8.** An officer's advisement that a person may decline their request or terminate the encounter is strongly indicative of a consensual encounter because a reasonable person is likely to feel that he or she is able to terminate the encounter when so advised. *See Bostick,* —— U.S. at ——, ——, 111 S.Ct. at 2385, 2388 (noting that "police specifically advised Bostick that he had the right to refuse consent" in rejecting claim that encounter on a bus was a per se seizure).

**9.** We also noted in *Ward* that the defendant was of "slight physique" and had "recently undergone a kidney transplant for which he was still taking medication." 961 F.2d at 1533. The defendant's physical characteristics, "relevant to the issue of coercion," suggested to us "that [the] defendant was more easily intimidated than some other persons." *Id.* A person's subjective characteristics may be relevant to the voluntariness of the person's consent. *See Schneckloth v. Bustamonte,* 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973) ("characteristics of accused" relevant to voluntariness question of "whether a defendant's will was overborne in a particular case"). *See also Mendenhall,* 446 U.S. at 558, 100 S.Ct. at 1879 (majority opinion) (noting age and education of defendant as evidence that defendant was "plainly capable of knowing consent"); *United States v. Recalde,* 761 F.2d 1448, 1454 (10th Cir.1985) (defendant's upbringing in Argentina, which instilled acquiescence to police authority, relevant to whether person's consent was the product of coercion). However, recent Supreme Court decisions cast doubt on this issue. *See Florida v. Jimeno,* —— U.S. ——, 111 S.Ct. 1801, 1803–04, 114 L.Ed.2d 297 (1991) ("[S]cope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?"); *Illinois v. Rodriguez,* 497 U.S. 177, ——, 110 S.Ct. 2793, 2801, 111 L.Ed.2d 148 (1990) ("[P]erson's authority to consent to search of premises must be judged against an objective standard: would the facts available to the officer at the moment warrant a man of reasonable caution in the belief that the consenting party had authority over the premises?") (citation, internal quotation and ellipses omitted). The Supreme Court's recent focus on the "reasonableness" of

the law enforcement officer's conduct suggests that the subjective characteristics of the defendant may no longer be relevant to the voluntariness of the consent other than to the extent that the characteristics are known to the officer.

Nevertheless, while the voluntariness of a person's consent may be a question of fact involving the person's subjective understanding, *see Schneckloth,* 412 U.S. at 248–49, 93 S.Ct. at 2058–59; *McKines,* 933 F.2d at 1425, whether a person has been seized is a legal question governed by the "reasonable person" standard which by definition precludes consideration of the defendant's subjective characteristics and perceptions. *See California v. Hodari D.,* —— U.S. ——, —— ——, 111 S.Ct. 1547, 1551–52, 113 L.Ed.2d 690 (1991) ("[O]bjective" test for determining whether person is "seized" asks "not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person."); *Delgado,* 466 U.S. at 228, 104 S.Ct. at 1768–69 (Brennan, J., concurring in part and dissenting in part) ("[R]ule properly looks not to the subjective impressions of the person questioned but rather to the objective characteristics of the encounter which may suggest whether or not a reasonable person believed that he remained free during the course of the questioning to disregard the questions and walk away.") (citation omitted). Incorporating a defendant's subjective characteristics into the seizure analysis would thwart the police from determining in advance "whether the conduct contemplated will implicate the Fourth Amendment" and would vary the scope of Fourth Amendment protection depending on the state of mind of the particular individual being approached. *Chesternut,* 486 U.S. at 574, 108 S.Ct. at 1979–80 (citation omitted). While we noted the defendant's subjective characteristics in *Ward* in the context of our seizure analysis, *Ward* was itself a consent case where such factors may still be relevant. Accordingly, we do not read *Ward* to hold that the subjective characteristics of the defendant are relevant in applying *Bostick*'s reasonable person test, other than to the extent that they may have been known to the officer and influenced his conduct.

train compartment without advising him that he was free to decline the agents' request or terminate the encounter. *Ward,* 961 F.2d at 1531–34. The fruits of this seizure—*i.e.* Defendant's statements concerning his mother's remains—can only be considered in determining the agents' reasonable suspicion to subsequently seize Defendant's luggage if the agents had a reasonable suspicion that Defendant was engaged in illegal activity when they began asking him directly incrimination questions.

## IV.

■ We review a district court's finding of reasonable suspicion under a clearly erroneous standard. *United States v. Walker,* 941 F.2d 1086, 1090 (10th Cir. 1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1168, 117 L.Ed.2d 414 (1992); *United States v. Turner,* 928 F.2d 956, 959 (10th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 230, 116 L.Ed.2d 187 (1991). *Accord United States v. Peoples,* 925 F.2d 1082, 1085 (8th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 370, 116 L.Ed.2d 322 (1991); *United States v. Rose,* 889 F.2d 1490, 1496 (6th Cir.1989). *Contra United States v. Silva,* 957 F.2d 157, 159 (5th Cir.1992); *United States v. Uribe–Velasco,* 930 F.2d 1029, 1032 (2d Cir.1991); *United States v. Mondello,* 927 F.2d 1463, 1470 (9th Cir.1991). However, "[t]he question of reasonable articulable suspicion ... should not be confused with the ultimate determination of reasonableness under the Fourth Amendment, which we review de novo." *Walker,* 941 F.2d at 1090 (citing *United States v. Pena,* 920 F.2d 1509, 1513–14 (10th Cir. 1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2802, 115 L.Ed.2d 975 (1991)). Thus, while the district court's factual findings concerning the agents' suspicion of criminal activity are subject to the clearly erroneous standard of review, *United States v. Werking,* 915 F.2d 1404, 1406 (10th Cir.1990), the question of whether such suspicion was reasonable under the Fourth Amendment is a question of law which we review de novo. *See United States v. McKinnell,* 888 F.2d 669, 672 (10th Cir.1989). Here, the district court found that the agents did not seize Defendant; therefore, the court did not consider whether such a seizure was supported by a reasonable suspicion. However, because the facts are undisputed, our task is simply to determine whether, as a matter of law, Agent Small's suspicion was reasonable under the Fourth Amendment.

■ To justify an investigative detention of a person, the officer must have a reasonable suspicion that the person is engaged in criminal activity. *United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989); *Terry v. Ohio,* 392 U.S. 1, 30, 88 S.Ct. 1868, 1884–85, 20 L.Ed.2d 889 (1968). "[T]he totality of the circumstances—the whole picture—must be taken into account. Based upon that whole picture, the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez,* 449 U.S. 411, 417–18, 101 S.Ct. 690, 694–95, 66 L.Ed.2d 621 (1981) (citations omitted). While the reasonable suspicion standard permits an officer to "draw[ ] inferences and make[ ] deductions ... that might well elude an untrained person," *id.* at 418, 101 S.Ct. at 695, the standard requires some "minimal level of objective justification" which the officer can articulate; an "inchoate and unparticularized suspicion or 'hunch' " is insufficient. *Sokolow,* 490 U.S. at 8, 109 S.Ct. at 1585–86 (quoting *INS v. Delgado,* 466 U.S. 210, 217, 104 S.Ct. at 1763 (1984); *Terry,* 392 U.S. at 27, 88 S.Ct. at 1883).

The Supreme Court has considered a variety of factors in various combinations in discerning reasonable suspicion of persons transporting narcotics. For example, in *Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983), a majority of the Court held that officers had reasonable suspicion when they knew that the defendant was traveling under an alias; had paid cash for a one way ticket from Miami to New York; was young, casually dressed and appeared nervous by looking around at other people; was carrying luggage that appeared heavy; and had filled out luggage identification tags but omitted an address and phone number. *Id.* at 493 n. 2, 502, 103 S.Ct. at 1322 n. 2, 1326 (plurality

opinion). *Accord id.* at 518, 103 S.Ct. at 1335 (Blackmun, J., dissenting); *id.* at 523, 103 S.Ct. at 1337–38 (Rehnquist, J., dissenting). *But cf. id.* at 512, 103 S.Ct. at 1331–32 (Brennan, J., concurring) (finding a seizure at the point officer's asked for identification and therefore not considering fact that defendant was traveling under an alias, and finding remaining facts insufficient to establish reasonable suspicion). Similarly, in *Florida v. Rodriguez*, 469 U.S. 1, 105 S.Ct. 308, 83 L.Ed.2d 165 (1984) (per curiam), the Court held that officers had a reasonable suspicion to detain the defendants whom they twice overheard saying "get out of here" after seeing the officers, who attempted to ·evade the officers, and who gave contradictory statements concerning their identity. *Id.* at 6, 105 S.Ct. at 311. In *Sokolow*, the officers had grounds to believe that the defendant was traveling under an alias, that he paid $2,100 in cash and was carrying nearly twice that amount, and that he traveled twenty hours from Honolulu to spend only forty-eight hours in Miami, and "taken together" these facts "amount[ed] to reasonable suspicion." 490 U.S. at 8–9, 109 S.Ct. at 1585–86. While many of the factors noted by the Court may be "quite consistent with innocent travel," *id.* at 9, 109 S.Ct. at 1586, each of these cases share some objectively suspicious activity—*e.g.* traveling under an alias, attempting to evade law enforcement—which would warrant further investigation by a reasonable law enforcement officer.

On the other hand, in *Reid v. Georgia*, 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980) (per curiam), the officers knew that the defendant had arrived at the airport early in the morning when law enforcement activity was diminished, had come from a source city where he stayed only one day, appeared to be trying to conceal the fact that he was traveling with a companion, and had no luggage other than a shoulder bag. *Id.* at 439, 441, 100 S.Ct. at 2753, 2754. The Court held that, as a matter of law, these circumstances did not support a reasonable suspicion. *Id.* at 441, 100 S.Ct.

at 2754. Thus, unlike *Royer, Rodriguez* and *Sokolow*, the officers were unable to articulate any objectively suspicious activity to justify an investigative detention.

Although "[t]he concept of reasonable suspicion . . . is not 'readily, or even usefully, reduced to a neat set of legal rules,' " *Sokolow*, 490 U.S. at 7, 109 S.Ct. at 1585 (quoting *Illinois v. Gates*, 462 U.S. 213, 232, 103 S.Ct. 2317, 2329, 76 L.Ed.2d 527 (1983)), we held in *United States v. Ward*, 961 F.2d 1526 (10th Cir.1992), that, under the facts of that case, "no court could have found a 'reasonable suspicion.' " *Id.* at 1529. In *Ward*, the officers received information from a "previously reliable source" that the defendant, a train passenger, had purchased a one-way ticket from Flagstaff, Arizona, to Kansas City, Missouri; had paid $600 cash for the ticket which he pulled out of his boot; had given a telephone number with a Tuscon, Arizona prefix at the time he made the reservation; and had reserved the largest private room suitable for a family but was traveling alone. *Id.* at 1528–29. *See Adams v. Williams*, 407 U.S. 143, 147, 92 S.Ct. 1921, 1923–24, 32 L.Ed.2d 612 (1972) (informant's tip carrying sufficient "indicia of reliability" may justify investigative detention). The officers subsequently learned that the defendant had moved to a smaller room at the conductor's suggestion. *Ward*, 961 F.2d at 1529 n. 1. When confronted by the officers, the defendant indicated that his only luggage was a shoulder bag, and he produced an Arizona driver's license with a different name than that on his train reservation which he explained by stating that a friend made the reservation. *Id.* at 1528, 1530. The officers knew all of these facts prior to seizing the defendant. Although the defendant was traveling under an alias, which the Supreme Court has recognized as an objectively suspicious factor and would seem to warrant further investigation in light of the other circumstances, we held that, as a matter of law, these facts did not support a reasonable suspicion.[10] *Id.* at 1529.

10. At some point during the questioning, the second officer left the train and checked on the

defendant's reservation. *Ward*, 961 F.2d at 1530. The second officer learned that the call-

The facts of the present case are even less supportive of a finding of reasonable suspicion than those in *Ward.* Like the defendant in *Ward,* Defendant was traveling alone from Arizona in a private train compartment and had paid cash for a one-way ticket shortly before his departure. Unlike the defendant in *Ward,* and even less supportive of reasonable suspicion, Defendant was traveling under his real name. While Defendant kept his luggage in his compartment, we do not view this fact as significant enough to distinguish this case from *Ward.* Moreover, Agent Small's testimony that Defendant's luggage was of a type commonly used by drug traffickers is afforded little weight in our analysis.

One fact that arguably distinguishes this case from *Ward* is that Defendant asked the train attendant about Agent Ochoa's presence on the train, and Defendant appeared to Agent Ochoa to be "very nervous" and "somewhat excited." The reasonable suspicion standard requires the officer to articulate objective facts giving rise to his suspicion. *Cortez,* 449 U.S. at 418, 101 S.Ct. at 695; *Terry,* 392 U.S. at 21, 88 S.Ct. at 1879–80. While Defendant's query to the train attendant is an articulable fact, it is not sufficient in light of the other circumstances to give rise to a reasonable suspicion. Curiosity concerning the presence of an armed law enforcement officer roaming about a form of public transportation is not inconsistent with innocent behavior. Moreover, Agent Ochoa's statement that Defendant appeared "very nervous" and "somewhat excited" is a subjective evaluation of Defendant's behavior. Nothing in the record indicates whether Agent Ochoa had any prior knowledge of Defendant, so we do not understand how Agent Ochoa would know whether Defendant was acting nervous and excited or whether he was merely acting in his normal manner.

*See United States v. Crawford,* 891 F.2d 680, 683 n. 4 (8th Cir.1989) (officer's description that defendant "appeared nervous," unsupported by specific facts was a "mere rephrasing of other evidence, offered in an attempt to enhance [its] value" and therefore given no weight by court). Rather, Defendant's appearance to Agent Ochoa is nothing more than an "inchoate suspicion or hunch," similar to the officer's belief in *Reid* that the defendant was trying to conceal the fact that he was traveling with a companion. *See Reid,* 448 U.S. at 441, 100 S.Ct. at 2754. *See also Brown v. Texas,* 443 U.S. 47, 51–52, 99 S.Ct. 2637, 2640–41, 61 L.Ed.2d 357 (1979) (officer's statement that defendant "looked suspicious" which was unsupported by any facts was insufficient to establish reasonable suspicion).

Each of the remaining facts known to the agents—*i.e.,* paying cash for a one-way ticket, traveling alone from Arizona to New York in private train compartment, high quality luggage kept in compartment—are wholly consistent with innocent travel. Additionally, all of the statements given by Defendant were corroborated by his identification and ticket. While factors consistent with innocent travel can, when taken together, give rise to reasonable suspicion, the "degree of suspicion" that attaches to these particular factors is minimal. *See Sokolow,* 490 U.S. at 9–10, 109 S.Ct. at 1586–87. Therefore, we hold that the agents lacked a reasonable suspicion to subject Defendant to an investigative detention. *See United States v. White,* 890 F.2d 1413, 1417–19 (8th Cir.) (officers lacked reasonable suspicion to detain defendant who was traveling alone from source city, purchased one-way ticket with cash, and appeared nervous), *cert. denied,* —— U.S. ——, 111 S.Ct. 77, 112 L.Ed.2d 50 (1990).

Accordingly, because Agents Small and Ochoa seized Defendant without a reason-

---

back number left with the defendant's train reservation was traceable to the defendant's name as indicated on his identification and that the defendant had boarded with two pieces of luggage. *Id.* We recognized that, at the point the second officer learned of these discrepancies in the defendant's story, the officers had a reasonable suspicion to detain the defendant. *Id.*

able suspicion when Agent Small began asking him directly incriminating questions, Defendant's subsequent statements concerning his mother's remains were the tainted fruit of the unlawful seizure of Defendant's person. Because the remaining circumstances are not otherwise sufficient to establish a reasonable suspicion that Defendant's luggage contained narcotics, Agent Small's subsequent seizure of Defendant's luggage was unreasonable under the Fourth Amendment. Therefore, the fruits of this illegal seizure must be suppressed.

REVERSED and REMANDED.