9 F.3d 118
 NOTICE: Although citation of unpublished opinions remains unfavored, unpublished opinions may now be cited if the opinion has persuasive value on a material issue, and a copy is attached to the citing document or, if cited in oral argument, copies are furnished to the Court and all parties. See General Order of November 29, 1993, suspending 10th Cir. Rule 36.3 until December 31, 1995, or further order.
 UNITED STATES of America, Plaintiff-Appellee,
v.
Simon Lucero GARCIA, Defendant-Appellant.
 No. 92-2097.
 United States Court of Appeals,
 Tenth Circuit.
 Oct. 27, 1993.
 
 ORDER AND JUDGMENT[1]
 Before LOGAN, GARTH[2] and SEYMOUR, Circuit Judges.
 
 
 1
 Defendant Simon Lucero Garcia appeals from the district court's judgment entered after his conditional guilty plea to possession with intent to distribute less than fifty kilograms of marijuana in violation of 21 U.S.C. 841(a)(1) and 21 U.S.C. 841(b)(1)(D). Defendant argues that the district court erred in denying his motion to suppress evidence allegedly seized in violation of the Fourth Amendment, and in sentencing him based on 10.8 net kilograms of marijuana and a criminal history category of II.
 
 
 2
 Defendant also argues that he has standing to challenge the search of the bags he was carrying. We do not understand the district court to have decided the case on the basis of defendant's standing. In any event, the government concedes that even if defendant is only the bailee of the suitcases involved here he has standing to challenge the search under our holding in United States v. Benitez-Arreguin, 973 F.2d 823 (10th Cir.1992).
 
 
 3
 * We review a district court's denial of a motion to suppress evidence under a clearly erroneous standard, and consider the evidence in the light most favorable to the district court's ruling. United States v. Nicholson, 983 F.2d 983, 987 (10th Cir.1993). The ultimate determination of reasonableness under the Fourth Amendment, however, is a question of law that we review de novo. Id.
 
 
 4
 Sherry Smith, a Mesa Airlines employee in Las Cruces, New Mexico, checked in defendant, who presented a ticket to Albuquerque issued under the name Sam Leclair. She placed defendant's luggage on the baggage cart, and noticed that defendant continued to stand by his luggage and pace back and forth. While Smith was loading the luggage onto the plane, she thought that defendant's two bags were light for their size and noticed that they smelled of fabric softener. Smith had been instructed by U.S. Customs agents that the smell of fabric softener often was used to mask the smell of contraband. When the airplane took off, Smith called Customs about her suspicions, and when no Customs agent returned her call, she called the Mesa Airlines ticket agent in Albuquerque, Robin Byus. Smith conveyed her concern to Byus and followed up with a computer message stating the passenger's name, Sam Leclair, and describing him and his baggage. Byus then telephoned airport police officer Dennis Brown, and told him a man scheduled to land in about ten minutes had checked in two bags with a strong odor of fabric softener and he had acted nervously. Byus also made a printout of Smith's communication which she later gave to officer Stephen Quackenbush.
 
 
 5
 After arranging for a narcotics detection dog to be dispatched to the airport, Brown and Quackenbush observed defendant, who met the ticket agent's description, among deplaning Mesa Airlines passengers, and watched him pick up two bags at the baggage area. As defendant was about to leave the area, Quackenbush approached and asked to speak to him; Brown joined them momentarily. Defendant was cooperative and agreed to accompany the officers to the airport police office nearby. Sometime during the initial encounter, either before or after the officers asked defendant his identity and discovered he was carrying no identification, one of the officers told defendant they had reason to believe he was carrying narcotics in his bags. Quackenbush testified that this was based on the airline employee's report.
 
 
 6
 Either during the initial encounter or en route to the police office, in response to their questions, defendant told the officers his name was Simon Garcia, he had no papers identifying himself, and that he came to Albuquerque to see his cousin, Angie Lucero. In the reception area of the police office, officer Brown asked defendant if he had a number to call his cousin and defendant said he did not. Brown then asked defendant if they could find Lucero's number in the phone book and defendant said, "Well, she just got married, and I don't know what her last name is now." II R. 24. Brown offered defendant a telephone directory and defendant paged through it and told Brown he could not find his cousin's number.
 
 
 7
 Brown then asked defendant if he could see his airline ticket. Defendant handed Brown his Mesa Airlines ticket issued under the name "Sam Leclair." Brown returned the ticket to defendant, told him to step inside the secured area of the police office, and then told defendant they needed to confirm his identity. When defendant stepped into the secured area of the office, he took the bags with him. There Brown asked defendant if he would consent to a search of his bags, but defendant refused. Within four to five minutes, officer James Torres arrived at the police office with a trained narcotics detection dog. After advising defendant of his Miranda rights, officers placed defendant's bags and several others from lost and found in the center of the room. Torres ran the dog by the luggage and he alerted on defendant's bags.
 
 
 8
 The officers testified that ten to twenty minutes elapsed from the time Quackenbush first established contact with defendant to the time the dog alerted on the two bags. Although defendant testified that it was forty-five minutes, the district court disbelieved his testimony. Thereafter, an officer obtained a search warrant, searched the suitcases and retrieved seventeen plastic and tape wrapped bundles of marijuana weighing approximately 25.1 pounds.
 
 
 9
 In denying defendant's suppression motion, the district court made only rather cryptic oral findings: "I don't have any trouble with the police stopping him at the airport.... Reasonable suspicion to stop him based on the tip they received from Ms. Smith. I also find that he's not in custody at that time, contrary to what he says, that he consents to go to the police...." II R. 102; see also id. at 108. "Well, they have reasonable suspicion to stop him. He consents then to go up to the aviation police office. He has his bags with him.... They did not take them away. The question as to whether or not he's free to go has not arisen because he has not asked whether he is free to go. The officer's testimony is that he consented to everything they asked." Id. at 103-04. Once the dog alerted, the court found probable cause to arrest defendant. Thus, the district court determined that the marijuana found in the bags pursuant to a search warrant properly could be used as evidence. Defendant argues that the police officers illegally seized him and the evidence obtained thereafter must be suppressed as fruit of the poisonous tree.
 
 
 10
 We are satisfied that the district court correctly found that the officers had sufficient reasonable suspicion of criminal activity, based upon the facts relayed by the airline employees, especially the smell of fabric softener, to justify a brief investigative detention under Terry v. Ohio, 392 U.S. 1 (1968). See United States v. Stone, 866 F.2d 359, 362 (10th Cir.1989) (strong scent of use of patchoucili oil, commonly used to mask smell of narcotics, one of two factors supporting probable cause that defendant was carrying drugs). That the officers advised defendant of their particularized suspicion of his bags does not dictate a different conclusion, because they were entitled to make a brief seizure of defendant to investigate. By the time defendant was taken to a secured area the police had heightened suspicion in addition to the airline employee's report--from defendant's calling himself by a different name than that on his ticket, his lack of identification, and his inability to locate or identify by phone, address or married name the cousin he allegedly was visiting. See Florida v. Rodriguez, 469 U.S. 1, 6 (1984) (per curiam) (contradictory statements about identity one of factors supporting reasonable suspicion to detain defendants).
 
 
 11
 The district court found defendant was detained no more than fifteen to twenty minutes, and determined that the length of detention was reasonable. See United States v. Sharpe, 470 U.S. 675, 683 (1985) (finding twenty minute Terry stop reasonable under all the circumstances). During this time, the police pursued a means of investigation that was likely to quickly confirm or dispel their suspicions. See United States v. Place, 462 U.S. 696, 702 (1983). Specifically, the officers attempted to confirm or dispel their suspicions by using the NCIC computer and asking defendant to find a number or address for his cousin whom he asserted he was in Albuquerque to visit. In addition, they already had requested a narcotics detection dog be dispatched and knew he was expected shortly. Defendant complains of the officers' ordering the dog before making the stop. But we have noted the Supreme Court's suggestion that the intrusiveness of investigatory seizures can be minimized by requesting that drug-sniffing dogs be brought to travel terminals. See United States v. Scales, 903 F.2d 765, 769 & n.8 (10th Cir.1990) (citing Place, 462 U.S. at 709). Thus, the officers properly attempted to limit the time of the detention by ordering the dog as soon as they received information on defendant.
 
 
 12
 Defendant argues that he was in essence under arrest when he was detained in the secured area of the police office. See Florida v. Royer, 460 U.S. 491, 499 (1983) (an investigative detention becomes unreasonable if "police seek to verify their suspicions by means that approach the conditions of arrest."). He cites our opinion in United States v. Bloom, 975 F.2d 1447 (10th Cir.1992), in support of his assertion. In Bloom, a consensual encounter became an investigative detention when DEA agents questioned the defendant "about whether he was transporting narcotics while he was confined in a private train compartment without advising him that he was free to decline the agents' request or terminate the encounter." Bloom, 975 F.2d at 1455-56. Defendant points out the similarities to Bloom--a nonpublic place, a police dominated atmosphere, and failure to advise defendant that he was free to terminate the encounter. In Bloom, however, the issue was whether there was reasonable suspicion to support the seizure, not whether the defendant was under arrest.
 
 
 13
 The Supreme Court has relied on seclusion of a defendant in a police interrogation room the size of "a large closet" as a key factor in holding probable cause was required. Royer, 460 U.S. at 502-03. The record does not reveal how large or how confining was the secured area of this police office; it did contain a desk and had a "center" of the room large enough to accommodate defendant's suitcases, others placed with them, and the dog. See II R. 27, 67. We also note that defendant felt free to tell the officers that he would not give consent to search the suitcases. The fact that defendant felt free to decline such a request suggests that a reasonable person in that circumstance would not believe he was under arrest. See United States v. Wynne, 993 F.2d 760, 764, 765 n.3 (10th Cir.1993). In the absence of more evidence of a coercive atmosphere than presented here we will not hold that defendant was under arrest when taken to the secured area of the police office.
 
 
 14
 Defendant also argues the officers lacked reasonable suspicion to detain his luggage and subject it to a dog sniff. We disagree. As we determined above, the officers had reasonable suspicion to detain both defendant and his luggage. See United States v. Place, 462 U.S. at 706 (if an "officer's observations lead him reasonably to believe that a traveler is carrying luggage that contains narcotics ... the officer [may] detain the luggage briefly" to expose it to a canine sniff); United States v. Williams, 726 F.2d 661 (10th Cir.) (reasonable suspicion to carry out dog sniff of defendant's luggage based on airline employee's report that defendant appeared nervous, bought one-way ticket with cash, denied knowing person defendant had been talking with, and was flying from "source" city), cert. denied, 467 U.S. 1245 (1984). Once the dog alerted to the suitcases, officers had probable cause to arrest defendant.[3] The district court did not err in denying defendant's motion to suppress.
 
 II
 
 15
 Defendant objected to two facts in the presentence report accepted by the district court: the net weight of marijuana of 10.8 kilograms, and the criminal history category of II. We review the district court's factual findings on sentencing guidelines matters under a clearly erroneous standard. See United States v. Pace, 981 F.2d 1123, 1134 (10th Cir.1992), cert. denied sub nom. Leonard v. United States, 113 S.Ct. 1401 (1993).
 
 
 16
 At the sentencing hearing and on appeal defendant urged that a "DEA Form 7" contained information that the wrapping of a sample brick constituted about forty percent of the gross weight. The probation officer, however, testified that he calculated the weight based on the DEA report stating the marijuana weighed 25.1 pounds, subtracted five percent for packaging, and arrived at a net weight of 10.8 kilograms. The officer testified that the information on the DEA Form 7 to calculate net weight can be confusing, explaining that the form referred only to a representative sample and did not provide a measure of net weight. The district court then stated forty percent in wrapping was unheard of, but he would accept an affidavit concerning the wrapping.
 
 
 17
 The DEA Form 7 states at item 12, "One (1) cardboard box containing eleven (11) representative samples of Exhibit # 1." I R. tab 21. Exhibit # 1 is identified as "Two (2) DELSEY hardsided suitcases containing 17 bundles of green vegetation." Id. The "Quantity Submitted" column shows 793 gross grams.
 
 
 18
 The "Laboratory Analysis Comparison Report" states in the "Received" line: "Green plant material 1 brick wrapped with masking tape and plastic and in 10 zip-loc plastic bags" and at the line for "Gross Wt: 797.4 gms;" "Net Wt: 433.3 gms." Id. A review of this form and the presentence report suggests that the approximately forty percent difference in the gross and net weight on the DEA Form 7 is accounted for by masking tape, plastic, and the cardboard box. In any case, defendant was given the opportunity to inspect the marijuana, and could have weighed it independently. At the continued sentencing hearing after defendant's inspection, he filed an affidavit stating he had no knowledge concerning the weight or packaging.
 
 
 19
 The trial court may base its calculation of weight on the presentence report. See United States v. Short, 947 F.2d 1445, 1457 (10th Cir.1991), cert. denied, 112 S.Ct. 1680 (1992). The trial court noted that a reduction of five to ten percent for wrapping is the standard. Our cases support that finding. See, e.g., United States v. Molina-Cuartas, 952 F.2d 345, 348 (10th Cir.1991), cert. denied, 112 S.Ct. 1698 (1992). The district court's finding of a net weight of 10.8 kilograms is supported by the record.
 
 
 20
 Defendant also objected to the criminal history calculations in the presentence report. Defendant's written objections to the presentence report state that "the presentence report assigns a 2-point criminal history score for time served in the New Mexico Boys School. Yet, the report does not document how much time was served at the unit or for what offense or offenses." Appellee's Answer Brief Addendum 1-2. In response, the probation officer contacted the school and confirmed defendant was incarcerated there from August10, 1987, to May25, 1989. The probation officer then correctly calculated that under U.S.S.G. 4A1.1(b) and 4A1.2, this offense constituted "60 days [of imprisonment] resulting from an offense committed prior to the defendant's 18th birthday for which the defendant was released from confinement within 5 years of the instant offense, [therefore] 2 points are added to the criminal history score." Addendum to Presentence Report at 2. Defendant failed to rebut this information although invited to do so, and the district court properly relied on the presentence report in finding a criminal history category of II. See Short, 947 F.2d at 1457.
 
 
 21
 AFFIRMED.
 
 
 
 [1]
 This order and judgment has no precedential value and shall not be cited, or used by any court within the Tenth Circuit, except for purposes of establishing the doctrine of the law of the case, res judicata, or collateral estoppel. 10th Cir. R. 36.3
 
 
 [2]
 The Honorable Leonard I. Garth, Senior United States Circuit Judge, United States Court of Appeals for the Third Circuit, sitting by designation
 
 
 [3]
 We note that defendant was "Mirandized" just before the dog sniff of his luggage. See II R. 66-69. Thus, it appears that he was arrested before probable cause was established. Defendant did not argue, however, that any incriminating information was gained between the time he was Mirandized and when the dog sniff was conducted. Once the dog alerted to the luggage, there was probable cause to arrest defendant