UNITED STATES of America, Plaintiff,

v.

Adrian Keith FINNELL, Defendant.

CR No. 92–379 JP.

United States District Court,
D. New Mexico.

July 29, 1998.

Michael E. Vigil, Marchiondo & Vigil, Albuquerque, NM, for defendants.

James D. Tierney, Albuquerque, NM, for Defendant.

## MEMORANDUM OPINION AND ORDER

PARKER, District Judge.

### I. BACKGROUND

On January 26, 1993, I filed an opinion in this and six other cases reported under *United States v. Miller*, 811 F.Supp. 1485 (D.N.M. 1993). The seven cases involved seizures on different dates by law enforcement officers of contraband from Amtrak train passengers, the defendants, who police questioned during the interval of a scheduled train stop in Albuquerque, New Mexico.[1] The facts I found that related to defendant Adrian Keith Finnell are set forth at 811 F.Supp. at 1510–

1. The defendants in the seven different cases were:

Bruce Bedrick
Grigory Donskikh
Santana Romero Dottery
Adrian Keith Finnell
Martin Kelly Miller
Carno Ian Payne
Peter Sola

The government did not appeal the suppression of evidence in the *Bedrick* and *Dottery* cases; instead, the government moved to dismiss those cases and they were dismissed prior to trial. On remand, I ordered the government to show cause why the *Donskikh* should not be dismissed; because the government was unable to show good cause, the *Donskikh* was then dismissed prior to trial. On remand, I again suppressed the evidence in the case against Martin Kelly Miller. The government then moved to dismiss the *Miller* case and it was dismissed prior to trial. After remand, I granted Carno Ian Payne's supplemental motion to suppress the same evidence that had been suppressed previously; the government then moved to dismiss the indictment and the case was dismissed prior to trial. Following remand, I denied Peter John Sola's motion to suppress evidence. Thereafter, the government and Mr. Sola entered into a plea agreement under the terms of which Mr. Sola pled guilty to a misdemeanor offense. The government moved to dismiss the felony indictment. Mr. Sola was sentenced to a period of probation. This case, in which Adrian Keith Finnell is the defendant, is the last of the five cases appealed by the government and remanded by the Tenth Circuit in which I have reconsidered the defendant's motion to suppress evidence in the light of *United States v. Little*, 18 F.3d 1499 (10th Cir.1994) and subsequent Tenth Circuit cases.

1512. My legal analysis of the significance of those facts appears at 811 F.Supp. at 1512–1515. I concluded that defendant Finnell's motion to suppress evidence should be granted on the ground that Mr. Finnell was seized at the outset of his encounter with Police Officer Candelaria without reasonable suspicion and the subsequent seizure of evidence and elicitation of statements were tainted by the prior illegal seizure of Mr. Finnell's person. On reconsideration, I reaffirm those conclusions.

On March 22, 1994, the United States Court of Appeals for the Tenth Circuit, *en banc*, issued several opinions in *United States v. Little*, 18 F.3d 1499 (10th Cir.1994) ("*Little I* "), which also involved a search and seizure on a train that had stopped in Albuquerque. The *Little I* majority opinion disavowed certain language and limited other language of the Tenth Circuit opinion in *United States v. Ward*, 961 F.2d 1526 (10th Cir.1992), on which I had relied, in part, in reaching my decisions in the seven cases reported under *United States v. Miller, supra*. *Ward* was yet another "train" case in which police had found drugs on a train during its Albuquerque stop. In *Little I*, the Tenth Circuit remanded the case for reconsideration to District Judge Burciaga, who also had followed the rulings in *Ward* when suppressing evidence.

The Tenth Circuit Court of Appeals reversed and remanded this case for further proceedings on the basis of *Little I*, stating:

> We refer all to *United States v. Miller*, 811 F.Supp. 1485 (D.N.M.1993), for the facts relevant to this appeal. We have concluded that this appeal should be remanded in light of *United States v. Little*, 18 F.3d 1499 (10th Cir.1994) (en banc), insofar as the factors evaluated by the district court do not constitute a nonconsensual encounter as a matter of law. *See id.* at 1504–05. We do note our agreement with the district court's conclusion that reasonable suspicion did not exist when Agent Candelaria began questioning Mr. Finnell. *See Unit-*

*ed States v. Hall*, 978 F.2d 616, 621 (10th Cir.1992); *United States v. Bloom*, 975 F.2d 1447, 1458 (10th Cir.1992).

> On remand, the district court should consider whether there existed a sufficient level of individualized suspicion necessary to seize Mr. Finnell's luggage. This inquiry should include whether this incident was really commenced by a search, whatever thereafter developed, requiring probable cause. *See United States v. Lemos*, 35 F.3d 513 (10th Cir.1994) (Seth, J. concurring).[2]

*United States v. Finnell*, 37 F.3d 586–87 (10th Cir.1994).

On September 8, 1994, then Chief United States District Judge Juan G. Burciaga issued an opinion in *United States v. Little*, 862 F.Supp. 334 (D.N.M.1994), again suppressing evidence after taking into account the principles announced in *Little I*. The United States of America appealed, for the second time, Judge Burciaga's suppression of evidence in the *Little* case. *United States v. Little*, 60 F.3d 708 (10th Cir.1995). ("*Little II* ").

Because I was aware that Judge Burciaga's second suppression of evidence in the *Little* case had been appealed by the government, I deferred ruling on the remand of this case until after the Tenth Circuit Court of Appeals decided the second appeal in *Little*. I had hoped that the opinion of the Tenth Circuit Court of Appeals in the second appeal of *Little* would further assist me, as a district judge, in carrying out the Court's charge quoted above.

A panel of the United States Court of Appeals for the Tenth Circuit issued its majority and dissenting opinions in *United States v. Little*, 60 F.3d 708 (10th Cir.1995). The government requested a rehearing of the second *Little* appeal, *en banc*. That was denied. With the less than uniform directions provided by the various opinions in *Little I* and *Little II* and subsequent Tenth

**2.** Counsel and I interpret this to mean that since I previously made extensive findings of fact, the presentation of additional evidence is unnecessary and I am merely to reconsider the weight to be given to various factors established at the evidentiary hearing on the motion to suppress in light of the new rules announced in *Little I* (as modified by opinions subsequent to *Little I* ).

Circuit opinions, I now reevaluate the facts in Mr. Finnell's case.[3]

## II. *ANALYSIS ON REMAND*

### A. *Seizure or Consensual Encounter.*

In *Miller*, I began the determination of whether a confrontation between police and a defendant was a seizure or a consensual encounter by studying the totality of the circumstances, as required by the United States Supreme Court in *Florida v. Bostick*, 501 U.S. 429, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991), by stating:

> In *Florida v. Bostick*, 501 U.S. 429, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991) the Supreme Court clarified the standard to be used in determining whether an encounter between a law enforcement officer and a citizen amounts to an investigative detention where factors other than the officer's presence would have made the defendant not feel free to leave. In such a case the Court directed that the "crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" *Bostick*, 501 U.S. at 435–37, 111 S.Ct. at 2387, *quoting Michigan v. Chesternut*, 486 U.S. 567, 569, 108 S.Ct. 1975, 1977, 100 L.Ed.2d 565 (1988); *see also Ward*, 961 F.2d at 1530.

*Miller*, 811 F.Supp. at 1489.

■ In the process of looking at the totality of the circumstances, I noted that the Tenth Circuit Court of Appeals in *Ward* had emphasized eight factors, among the totality of circumstances, that in combination established a seizure of a train traveler for purposes of the Fourth Amendment. 811

F.Supp. at 1490. I then listed those eight factors as follows:

1. The physical circumstances of the place of the encounter.
2. Aloneness during encounter.
3. A roomette traveler has a higher expectation of privacy.
4. Nature of questions.
5. Manner of questioning.
6. Failure to advise that the defendant had the right to decline the officer's request or terminate the encounter.
7. Number and attire of officers.
8. Personal traits of defendant.

811 F.Supp. at 1490–91.[4]

In *Little I*, the majority opinion of the *en banc* court diminished the significance of some of these factors that the panel of the Tenth Circuit had emphasized in its *Ward* opinion. In *Little II*, a two judge majority of the three judge panel appears to have attempted to breathe some life back into at least one of the factors that had been stressed in *Ward* but later was deflated in *Little I*. More recent Tenth Circuit opinions, such as those in *United States v. Sanchez*, 89 F.3d 715 (10th Cir.1996), and *United States v. Hernandez*, 93 F.3d 1493 (10th Cir.1996), seem to support and maybe extend the *Little II* opinion on the significance to be attributed to the place of the encounter. And, other opinions issued after *Little I* such as the one in *United States v. Orrego–Fernandez*, 78 F.3d 1497 (10th Cir.1996), contain language seemingly in conflict with *Little I*, that failure to inform a person that she or he may refuse to consent or to answer questions remains an "important" factor in an assessment of the totality of the circumstances. 78 F.3d at 1505 (citing and quoting from *United States v. McSwain*, 29 F.3d 558, 563 (10th

---

**3.** I acknowledge that performing the task, at a particular time, of evaluating the totality of circumstances in a case with numerous variables under shifting legal standards is somewhat akin to practicing scapulimancy or pursuing some other exotic, esoteric method of divination.

**4.** In spite of the lengthy discussion of these eight factors in *Miller* and the fact that the location of an encounter (inside a roomette or elsewhere) was only one of the eight factors considered, the

*Little I* opinion inexplicably states in its Footnote 4:

> Similarly, even though this court has never explicitly adopted a *per se* rule regarding encounters inside train roomettes, some lower courts attempting to apply our decisions have concluded that our court has in practice followed a *per se* rule that such encounters are seizures. *See United States v. Miller*, 811 F.Supp. 1485, 1489 (D.N.M.1993).

18 F.3d at 1503 n.4.

Cir.1994)). I will reconsider the eight factors outlined in my *Miller* opinion, this time analyzing them in the context of *Little I's* rejection or deemphasis of certain *Ward* factors and the apparent tentative retreat from some of the *Little I* language in *Little II, Sanchez, Hernandez, Orrego–Fernandez,* and other later opinions.

### FACTOR 1. *The physical circumstances of the place of the encounter.*

■ I found in *Miller* that Mr. Finnell was questioned in a small, private roomette:

> Defendant and Candelaria were alone together throughout the entire encounter with defendant remaining at all times within his small private roomette which was 6 feet 6 inches long and 3 feet 6 inches wide.

811 F.Supp. at 1511.

Judge Logan, the author of the *Ward* opinion, had been particularly concerned about Mr. Ward having been questioned in the nonpublic, cramped confines of his small roomette. Indeed, in his dissenting opinion in *Little I,* Judge Logan explained that when he wrote the *Ward* opinion this factor had "weighed substantially in favor of finding an unlawful seizure." 18 F.3d at 1509. Frankly, because Judge Logan had so emphasized it, I was strongly influenced by this *Ward* factor as I apportioned the entire weight of the totality of the circumstances among the eight component factors in Mr. Finnell's case. On this subject, the majority opinion in *Little I* reads:

> Just as *Bostick* explicitly rejected any categorical distinctions based on the location of a police-citizen encounter on a bus (inside the bus, outside the bus, or in the bus terminal lobby), so, too, we reject the argument that the location of an encounter on a train (outside the train, in a public coach, or in a private roomette) is determinative of the seizure question. Any implication to the contrary from our previous opinions is overruled.

18 F.3d at 1504.

Moreover, even though the majority in *Little I* acknowledged that under *Bostick* the particular location of an encounter is one factor to be taken into account in applying the "totality of the circumstances" test, 18 F.3d at 1503, Judge Anderson, writing for the majority, challenged the assumption that a person interrogated in a private roomette would be more vulnerable to coercion than someone questioned in a public car. 18 F.3d at 1504 n. 5. This suggests that, while the majority in *Little I* gave lip service to the place of the encounter being an ingredient of the "totality" mix, in the majority's view location of the encounter is comparatively unimportant. On the other hand, the *Little II* majority opinion seems to elevate this factor somewhat. Judge Holloway, the author of the two judge majority opinion in *Little II,* listed location as the first factor among the three that he believed, in combination, were enough to support Judge Burciaga's second suppression ruling in the *Little* case. *Little II,* 60 F.3d at 713. Judge Holloway noted that there were two components to Judge Burciaga's finding regarding location—it was "in a confined space" and, in addition, it was "outside of public view." *Id.* at 712. I, similarly, found that Officer Candelaria questioned Mr. Finnell while they were alone together. "Candelaria testified that he heard no other voices while he was alone with defendant and that no other persons passed by in the hallway." 811 F.Supp. at 1511.

Even though *Little II* appears to have moved off of the position taken by the majority in *Little I,* Judge Holloway did not refer back to the significance—substantial weight—given to this factor in the *Ward* opinion. On the other hand, the more recent opinion in *United States v. Sanchez, supra,* seems to give "interaction in a non-public place or a small, enclosed space" equal stature with various other "factors that could lead a reasonable innocent person to believe that he is not free to disregard the police officer...." 89 F.3d at 718. Certainly, I was influenced by the importance Judge Logan assigned to this factor in the *Ward* opinion and I decided that Officer Candelaria's encounter with Mr. Finnell in a small, private roomette significantly contributed to the coercive nature of the encounter. On reconsideration, I will reduce the weight I previously gave to this factor and I will treat it as being

significant, but as having no greater importance than the other factors.

### FACTOR 2. *Aloneness during encounter.*

In *Ward,* Judge Logan had written "a reasonable, innocent person who is alone when approached by a law enforcement officer is more likely to feel that he or she was the specific object of the officer's inquiry." 961 F.2d at 1532. In *Miller,* I noted that Mr. Finnell was alone with Officer Candelaria throughout the encounter. 811 F.Supp. at 1511. In *Little I,* the majority specifically rejected the defendant's argument that "because Ms. Little was a woman traveling alone, she, as the defendant in *Ward,* would be more easily intimidated than some other person." The majority opinion in *Little I* did not separately comment on the factor of "aloneness." Instead, it seemed to lump "aloneness" in with the factor of a defendant's personal traits, the last of the eight factors that I looked to in my *Miller* opinion. In his opinion following remand, Judge Burciaga did not include "aloneness" among the factors that he found caused the encounter with Ms. Little to be nonconsensual. The opinion in *Little II* makes no reference to "aloneness" as being part of a totality of the circumstances analysis. The conclusion that I draw from this is that while Judge Logan in the *Ward* opinion expressed a belief that "aloneness" mattered a great deal, this is not a view widely shared by the judges on the Court of Appeals. On the other hand, long after *Little I* and *Little II* were issued, the Tenth Circuit once more counted "absence of other members of the public" as a factor to be taken into account. *United States v. Sanchez, supra,* 89 F.3d at 718. Ergo, I will modify my earlier understanding that a district judge must give more than average weight to this factor, and I will attribute to it roughly the same importance I assign to the other pertinent factors.

### FACTOR 3. *A roomette traveler has a higher expectation of privacy.*

The opinion in *Ward* had spoken of a higher expectation of privacy of a traveler in a roomette as opposed to that of a passenger in a public car. In *Little I,* the majority held that "such roomettes do not confer upon occupants the same degree of privacy as a dwelling or hotel or motel room" and specifically overruled any contrary statements in prior Tenth Circuit opinions. Further, in *Little I,* the majority noted that whatever the degree of expectation of privacy a traveler has in a train roomette "has only limited relevance to the question of whether a police-citizen encounter in such a roomette is consensual." 18 F.3d at 1505. On remand, Judge Burciaga made no finding about expectation of privacy. Hence, in *Little II,* Judge Holloway did not mention it in the majority opinion. After *Ward* but prior to my opinion in *Miller* and the opinion in *Little I,* the Tenth Circuit had stated that heightened expectation of privacy in a roomette had "limited relevance" except where a search of the compartment was involved. *United States v. Bloom,* 975 F.2d 1447, 1453 n.6. In *Miller* I indicated that I would follow the *Bloom* language and assign this factor "limited relevance, without ignoring it completely" in a case which did not involve a room search. 811 F.Supp. at 1490. *Little I* and *Little II* did not change the picture. The Court in *United States v. Sanchez, supra,* listed eight "factors that could lead a reasonable innocent person to believe that he is not free to disregard the police officer," but did not include heightened expectation of privacy in a roomette among the eight factors. 89 F.3d at 718.

The opinion of the Tenth Circuit directed that, on remand, I should determine "whether this incident was really commenced by a search, whatever thereafter developed, requiring probable cause. *See United States v. Lemos,* 35 F.3d 513 (10th Cir.1994, Seth, J. concurring)."

Although there are similarities between the facts of this case and those in *Lemos,* certain facts in *Lemos* that Judge Seth felt were critical to the decision that the encounter with the defendant, Mr. Lemos, was a search from the beginning, are absent from this case involving Mr. Finnell. After applying a *Lemos* analysis to the facts of this case, I conclude that Officer Candelaria did not commence his meeting with Mr. Finnell by a search of Roomette 8. *See* discussion of *Le-*

*mos* Analysis, *infra.* Consequently, I adhere to my original decision about the weight to be given this factor. 811 F.Supp. at 1490.

**FACTOR 4. *Nature of questions.***

 The *Ward* opinion states that someone's feeling that she or he was the specific object of an officer's inquiry "would be heightened when the officers make not just general inquiries, but ask focused, potentially incriminating questions." 961 F.2d at 1532. While *Ward* indicated that this was a factor to be taken into account under the totality of the circumstances test, the opinion in *Little I* flatly rejected such a notion:

> The asking of "incriminating questions" is irrelevant to the totality of the circumstances surrounding the encounter. Indeed, *Bostick* specifically observed that police officers ask such questions, and in no way suggested that there is anything unlawful in the practice.

18 F.3d at 1506.

In *Little II,* the majority attributed significance to Judge Burciaga's reliance upon Agent Small's "accusatory, persistent, and intrusive" questioning. 60 F.3d at 712, 713. Although the word "persistent" merely refers to the manner of questioning instead of the nature of the questions asked, the words "intrusive" and "accusatory" suggest that by their *nature* the questions were "incriminating." Nonetheless, in *Little II* Judge Holloway finessed this issue by stating that although in *Little I* the Court held that "[t]he asking of 'incriminating questions' is irrelevant to the totality of the circumstances .... [W]e did not hold that the manner of asking incriminating questions was irrelevant." 60 F.3d at 712. Hence, *Little II* appears to place "accusatory, persistent and intrusive" all within the *manner of questioning* category and outside the ambit of *asking "incriminating questions."* In 1996, the opinion in *United States v. Sanchez, supra,* reconfirmed that "use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory" is something courts should consider. 89 F.3d at 718. Thus, to be consistent with *Little I, Little II,* and *United States v. Sanchez,* I must erase from the totality of the circumstances analy-sis the factor of the nature of the questions, i.e., the asking of incriminating questions. In the *Miller* opinion I did place importance on the asking of incriminating questions. I stated:

> While alone with defendant, as in *Ward* and *Bloom,* Candelaria asked focused, potentially incriminating questions in an assertive, authoritative manner which would " 'heighten' the feeling that the person [being questioned] 'was the specific object of the officers' inquiry,' and lead a reasonable person to believe that he or she was less able to terminate the encounter." *Bloom,* 975 F.2d at 1454 (quoting *Ward* at 1532).

811 F.Supp. at 1513. Since it now is irrelevant to the totality of the circumstances inquiry, the "nature of questions" factor falls out of Mr. Finnell's equation.

**FACTOR 5. *Manner of Questioning.***

The opinion in *Ward* expressed concern about the officers' "blunt" and "direct" manner of questioning. In the *Miller* opinion I found that Officer Candelaria questioned Mr. Finnell "in an assertive, authoritative manner" while Officer Candelaria positioned himself so that Mr. Finnell had to lean forward, while remaining seated, during the conversation. In Officer Candelaria's words, this "inconvenienced" Mr. Finnell. 811 F.Supp. at 1511, 1513. As noted in my factual findings, Officer Candelaria from the very start asked Mr. Finnell questions in a rapid, confusing way not allowing time for a considered response:

> Defendant opened the door to the compartment. Defendant's verbal response to Candelaria's request to speak with him is unclear as this question was immediately followed by Candelaria's second question of "[h]ow is your trip going today?" The tape recording reveals that defendant was not given time to answer the first question before Candelaria propounded the second. Thus, while defendant responded "[a]ll right" to Candelaria's compound inquiry, this reply may well have been a response to the second question concerning the quality of his trip and not an answer to the first concerning consent to talk. Regard-

less of which question defendant actually responded to, Candelaria's method of requesting consent to speak with defendant did not allow time for a .considered response. In addition, and most importantly, at no time before or during the encounter did Candelaria explain to defendant that he did not have to speak with Candelaria, that he could terminate the conversation at any time or that defendant could refuse consent to search his luggage.

811 F.Supp. at 1511. Hence, I add the adjectives "rapid" and "confusing" to "assertive" and "authoritative" to describe fully Officer Candelaria's manner of questioning Mr. Finnell.

In announcing his initial granting of Ms. Little's motion to suppress, Judge Burciaga observed that Agent Small had been "very pointed in his questioning of the defendant, and he was asking incriminating questions." *Little I*, 18 F.3d at 1502. Judge Burciaga touched both bases—manner of questioning: "pointed," and nature of questions: "asking incriminating questions." As to these findings of Judge Burciaga, the majority opinion in *Little I* states: "Finally, we turn to the district court's reliance on the fact that 'Agent Small was very pointed in his questioning of the defendant, and he was asking incriminating questions.'" 18 F.3d at 1505. Despite stating that it was turning to both findings by Judge Burciaga, the *Little I* majority opinion focused only on the asking of "incriminating questions" which it deemed to be "irrelevant to the totality of the circumstances surrounding the encounter." 18 F.3d at 1506. Consequently, the majority opinion in *Little I* provides no guidance as to whether the *manner* of questioning ("pointed" under Judge Burciaga's first ruling) is a factor that is relevant to the totality of the circumstances.

On the other hand, in *Little II*, Judge Holloway relied upon Judge Burciaga's redescribed *manner* of questioning as a strong underpinning for upholding the second ruling suppressing evidence. On remand, Judge Burciaga had beefed up his description of the manner of questioning by calling it "accusatory, persistent, and intrusive." 862 F.Supp.

at 335. Judge Holloway then said the following about this language in *Little II:*

> In *Little I* we held that "[t]he *asking* of 'incriminating questions' is irrelevant to the totality of the circumstances surrounding the encounter." 18 F.3d at 1506 (emphasis added). However, we did not hold that the manner of asking incriminating questions was irrelevant. Nor would it be proper to do so. "Accusatory, persistent, and intrusive" questioning can turn an otherwise voluntary encounter into a coercive one. *See Bostick,* 501 U.S. at 437, 111 S.Ct. 2382 ("no seizure occurs when police ask questions of an individual, ask to examine the individual's identification, and request consent to search his or her luggage—*so long as the officers do not convey a message that compliance with their requests is required.*" (Emphasis added.)). Therefore, it was not error for the district judge to find that there was an "accusatory, persistent and intrusive nature of the questioning," *Little II,* 862 F.Supp. at 335, and to consider this factor in his analysis of the totality of the circumstances.

60 F.3d at 712–13.

So, it appears to be acceptable, at least to some extent, to use the factor of the *manner* of questioning ("blunt" and "direct" from *Ward;* "pointed" from Judge Burciaga's initial *Little* ruling; "accusatory, persistent and intrusive" from Judge Burciaga's second *Little* ruling and *Little II;* "aggressive language or tone of voice" from *Sanchez* ) in trying to fathom the result of a totality of the circumstances analysis in Mr. Finnell's case. Under the facts of this case, this factor deserves more than middling weight. Here, there was the additional matter of Officer Candelaria standing above Mr. Finnell during the conversation in a way that "inconvenienced" Mr. Finnell while propounding the questions in a rapid, confusing, assertive, and authoritative manner.

**FACTOR 6.** *Failure to advise that the defendant had the right to decline the officer's request or terminate the encounter.*

█ Judge Logan, the author of the *Ward* opinion, asseveratively stated that this was

"an important factor." *Little I,* 18 F.3d at 1510 (Logan, J. dissenting). As to this factor, the pertinent facts of *Little* portray a mixed bag. While Agent Small never told Ms. Little that she did not have to talk to him or that she could terminate their encounter, Agent Small did advise Ms. Little that she did not have to consent to a search of her bag. In contrast, Officer Candelaria requested Mr. Finnell's consent to search the bag in Mr. Finnell's roomette and Mr. Finnell refused consent, but Officer Candelaria never told Mr. Finnell that he could decline consent to search, that he did not have to talk to Officer Candelaria, or that he could terminate the encounter at any point. In the *Little I* majority opinion Judge Anderson first simply noted the absence of a *per se* rule requiring an officer to advise a suspect that he had the right to refuse to answer the officer's questions. 18 F.3d at 1505. Next, Judge Anderson observed that Agent Small's "unambiguous and explicit advisement" that Ms. Little did not have to consent to a search of her luggage was "relevant to the totality of the circumstances," *id.,* suggesting that this advice regarding consent to search may have balanced out the lack of advice about answering questions. Without calling the omission of advice of rights an "important factor" as Judge Logan did in his dissent in *Little I,* 18 F.3d at 1510, Judge Holloway writing for the majority in *Little II* reiterated that this factor is still viable:

> The giving of such advisements is relevant to the inquiry, and it logically follows that the omission of such advisement is also relevant, while not dispositive, in making the finding "whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officer's request or otherwise terminate the encounter." *Bostick,* 501 U.S. at 439, 111 S.Ct. 2382.

60 F.3d at 713.

Trying to synthesize the language of *Ward,* as explained in the *Little I* dissent by Judge Logan, the majority opinion in *Little I,* and the majority opinion in *Little II,* in an effort to ascertain what weight most of the judges on the Court of Appeals would assign to this factor, I am led to this conclusion:

omission of advice about the right to say nothing or to terminate an encounter with police or to decline consent to search is somewhat less than an "important" factor, certainly is not "dispositive," and probably languishes somewhere in the mid-range of significance when considering the totality of the circumstances. Therefore, without being more specific, I will assign intermediate weight to this factor. However, because of the differences in what Agent Small said to Ms. Little and what Officer Candelaria told Mr. Finnell about their rights, Mr. Finnell obviously has a somewhat stronger factual position under which this factor is to be considered.

**FACTOR 7.** *Number and attire of officers.*

The *Ward* opinion commented on the presence of more than one officer increasing "the coerciveness of an encounter." 961 F.2d at 1533. Later, in *Bloom,* 975 F.2d at 1454, the Court of Appeals indicated that if an officer is in uniform and visibly armed the coercive effect is greatly enhanced. The statement of facts in *Little I* made no reference to the attire of the officers but did indicate that two were present during at least part of the encounter with Ms. Little. Apparently Judge Burciaga made no findings regarding the attire of the officers and attributed no significance to the presence of a second officer. In the "DISCUSSION" section of the majority opinion in *Little I,* 18 F.3d at 1503–06, the factor concerning the number and attire of officers was ignored. On remand, Judge Burciaga appeared not to have relied on the number and attire of the police officers in deciding that Ms. Little's encounter was nonconsensual and this was not discussed in the *Little II* opinion. Since the majority opinion in *Little I* did not reject the comments in *Ward* and *Bloom* about the coercive effect of multiple uniformed officers, visibly armed, these are matters that remain part of the totality of the circumstances analysis. Indeed, later in *United States v. Sanchez, supra,* the Tenth Circuit reiterated that "the threatening presence of several officers; the brandishing of a weapon by an officer" are two of "several factors that could lead a reasonable innocent person to believe that he is not free to disregard the police offi-

cer...." 89 F.3d at 717. However, this is of little import to the analysis in this case. Officer Candelaria was the only law enforcement officer to have direct contact with Mr. Finnell during the relevant times. I found that Officer Candelaria, who is smaller than Mr. Finnell,[5] was dressed in "plainclothes and carried a weapon and handcuffs concealed in a fanny pack." 811 F.Supp. at 1510. Officer Candelaria commenced the visit with Mr. Finnell by displaying his badge from the outside of the door window of Mr. Finnell's roomette and by asking if he could talk to Mr. Finnell. *Id.* Since Officer Candelaria was in plainclothes and never brandished his weapon, the concerns expressed in *Ward, Bloom,* and *Sanchez, supra,* about uniformed, visibly armed officers enhancing the coercive effect of an encounter do not apply to Mr. Finnell.

**FACTOR 8. *Personal traits of defendant.***

In the *Miller* opinion, I declined to follow the *Ward* opinion to the extent that it approved consideration of subjective characteristics and perceptions of a defendant as a part of the totality of the circumstances analysis. Instead, I opted to follow the approach taken by the Tenth Circuit in its later opinion in *Bloom, supra,* after noting the conflict between *Ward* and *Bloom* on this subject. As to this factor, in *Miller* I said:

> Under these circumstances, being uncertain as to how the issue ultimately will be resolved, I will (1) make factual findings regarding personal traits of the defendants in these cases before me so those factual determinations will be available to whichever panel or panels may revisit the issue on appeal, but I will (2) apply an objective "reasonable person" test in determining whether and when a seizure has occurred, since that is my understanding of the messages of *Bostick* and *Hodari;* and I will therefore attribute no significance to a defendant's personal traits that I find to be established by the evidence unless they

were known to and influenced the conduct of the law enforcement officer.

811 F.Supp. at 1491–92.

The majority opinion in *Little I* endorsed this way of handling evidence about a defendant's personal traits. The *Little I* majority opinion says:

> While in *Ward* we observed that the defendant's "slight physique" and the fact that he had "recently undergone a kidney transplant for which he was still taking medication" suggested that he "was more easily intimidated than some other persons," *Ward,* 961 F.2d at 1533, subsequent opinions have more clearly stated our view of the propriety of considering the particular personal traits or subjective state of mind of the defendant. We stated in *Bloom,* and reiterated in *Laboy* and *Zapata,* that the particular personal traits or subjective state of mind of the defendant are irrelevant to the objective "reasonable person" test set out in *Bostick,* "other than to the extent that they may have been known to the officer and influenced his conduct." *Bloom,* 975 F.2d at 1455 n. 9; *see also [U.S. v.] Zapata,* 997 F.2d [751] at 757 [(10th Cir.1993)]; *Laboy,* 979 F.2d at 799. Thus, unless there is evidence that Agent Small knew of any particular personal traits or characteristics of Ms. Little, and they influenced his conduct, they are irrelevant to the question of whether the encounter between Agent Small and Ms. Little was consensual and we reject any rule that would classify groups of travelers according to gender, race, religion, national origin or other comparable status.

18 F.3d at 1505.

I found, specifically, that "[t]here was no evidence that defendant was suffering from any infirmities at the time of the encounter." 811 F.Supp. at 1511. Hence, Factor 8 plays no role in the totality of the circumstances analysis.

**Conclusion—*Seizure at Inception.***

As ordered, I have reconsidered the facts regarding Mr. Finnell on remand and, once

---

**5.** "The government presented evidence that defendant was taller and heavier than Candelaria."

811 F.Supp. at 1511.

more, conclude that, under the totality of the circumstances, Officer Candelaria seized Mr. Finnell as soon as Officer Candelaria began questioning Mr. Finnell in Sleeper Roomette 8. In reaching this conclusion, I have placed on a figurative balance scale those factors among the eight discussed above [6] that, under the current state of Tenth Circuit law, I am permitted to take into account, along with their appropriate comparative weights, and find that, in sum, the scale tips toward the side of a seizure of Mr. Finnell at the time Officer Candelaria began interrogating him:

(1) in Mr. Finnell's small, enclosed, confined quarters—Roomette 8;

(2) while Mr. Finnell was alone with Officer Candelaria, i.e. in the "absence of other members of the public";

(3) while standing over Mr. Finnell peering down on him and causing Mr. Finnell to be in an "inconvenienced" position as Officer Candelaria's started the questioning;

(4) while interrogating Mr. Finnell in a rapid, confusing, assertive, and authoritative manner; and

(5) without telling Mr. Finnell that he had (a) the right not to answer questions, (b) the right to terminate the interrogation at any time, and (c) the additional right not to consent to a search.

Under these circumstances, Officer Candelaria's conduct would have immediately communicated to a reasonable person occupying Mr. Finnell's position that he was without liberty to ignore Officer Candelaria and go about his business. *See Bostick, supra,* 501 U.S. at 437.

### B. *Reasonable Suspicion.*

Judge Kelly wrote the opinion for the two-judge majority of the three-judge panel that ruled on the appeal in this case. His opinion states, in part:

We do note our agreement with the district court's conclusion that reasonable suspicion did not exist when Agent Candelaria began questioning Mr. Finnell.

*U.S. v. Finnell,* 37 F.3d 586 (10th Cir.1994).

Although he concurred in the remand, Judge McWilliams disassociated from the just-quoted sentence, saying, to the contrary, "I doubt that I agree with such comment, and in any event, deem it to be unnecessary." 37 F.3d at 587 (McWilliams, J. concurring).

After expressing the view that there was no reasonable suspicion of criminal activity at the point Agent Candelaria began talking to Mr. Finnell, Judge Kelly commanded that "on remand, the District Court should consider whether there existed a sufficient level of individualized suspicion necessary to seize Mr. Finnell's luggage." 37 F.3d at 586. I have concluded that Officer Candelaria seized Mr. Finnell when Officer Candelaria began his questioning of Mr. Finnell. At that point, under my prior ruling in which the appellate majority concurred, Officer Candelaria lacked information sufficient to support a reasonable, individualized suspicion that Mr. Finnell was engaging in criminal wrongdoing. Hence, Officer Candelaria's seizure of Mr. Finnell at that juncture was unreasonable and in violation of the Fourth Amendment to the Constitution of the United States. A very short time later within Roomette 8, Officer Candelaria's seized Mr. Finnell's bag without consent, overriding Mr. Finnell's protest. Since Officer Candelaria seized the bag soon after illegally seizing Mr. Finnell, without any significant intervening occurrences, the bag must be suppressed as evidence. *Wong Sun v. United States,* 371 U.S. 471, 484–488, 83 S.Ct. 407, 415–418, 9 L.Ed.2d 441 (1963). No additional analysis of the "level of individualized suspicion necessary to seize Mr. Finnell's luggage" would appear to be needed under these circumstances.

---

**6.** In *United States v. Sanchez, supra,* the Tenth Circuit identified a few additional factors that would indicate seizure, none of which are relevant under the facts of this case:

the brandishing of a weapon by an officer; some physical touching by an officer; ... pro-

longed retention of a person's personal effects such as identification and plane or bus tickets; a request to accompany the officer to the station. ...

89 F.3d at 718 (citing *United States v. Laboy,* 979 F.2d 795, 798–99 (10th Cir.1992)).

## C. *No Search from Inception Requiring Probable Cause—Lemos Inquiry.*

As previously noted, the Tenth Circuit ordered that I decide whether the incident began with a search requiring probable cause. I begin this discussion by reiterating that my conclusion that Officer Candelaria seized Mr. Finnell at the point they first met at Roomette 8 is independent of and not influenced by a determination of whether, under the principles set forth in Judge Seth's concurring opinion in *Lemos,* Officer Candelaria was conducting a search from the beginning. In other words, I would find that Officer Candelaria seized Mr. Finnell at the inception of their meeting, as I did in my original opinion, even in the absence of an analysis of whether Officer Candelaria was conducting a search of Roomette 8 from the start.

Interestingly, Officer Candelaria was the protaganist in both this case and the *Lemos* case.

In his concurring opinion In *Lemos,* Judge Seth concluded that "with the opening of the door, a search was then and there begun, a search of at least questionable validity which culminated in the seizure." 35 F.3d at 514. Judge Seth stressed that certain facts in the *Lemos* case were of special importance in establishing that Officer Candelaria was engaged in a search from the point that he knocked on Mr. Lemos' roomette door:

1. Prior to knocking, Officer Candelaria could not see into the roomette.

2. Officer Candelaria knocked on Mr. Lemos' door without announcing his identity which caused Mr. Lemos to open the door as Officer Candelaria expected he would.

3. Upon the opening of the door, because Officer Candelaria was in such close proximity and because the compartment was so small, the entire interior was immediately visible such that he could see the large black Samsonite suitcase and the multi-colored duffel bag. Seeing the large black Samsonite suitcase was a "critical factor" suggesting the presence of drugs because in Officer Candelaria's experience, this was the type of luggage often used by drug couriers.

In contrast, when Officer Candelaria knocked on Mr. Finnell's door, Mr. Finnell pulled aside the window curtain so that Officer Candelaria could see into the roomette before the door was opened. When Mr. Finnell pulled aside the curtain, Officer Candelaria pressed his police badge against the window, identified himself as a police officer, and asked Mr. Finnell (although in a confusing way), "Could I speak to you for a second?" Even after Mr. Finnell opened the door to his roomette, the small bag which contained heroin was not immediately visible, unlike the large black Samsonite suitcase and multi-colored duffel bag in Mr. Lemos' roomette.

Because of these critical distinctions in the facts, it appears that under the principles applied by Judge Seth in *Lemos,* it cannot be concluded that Officer Candelaria was conducting a search of Mr. Finnell's roomette from the beginning.

Although I have concluded that Officer Candelaria was not conducting a search that required probable cause from the inception of his meeting with Mr. Finnell, I reaffirm my original conclusion that defendant Finnell's motion to suppress must be granted on the ground that Officer Candelaria seized Mr. Finnell at the outset of the encounter without reasonable suspicion which tainted the subsequent seizure of evidence from the roomette.

IT IS THEREFORE ORDERED that defendant's Motion to Suppress is GRANTED, and trial of this case is scheduled on a trailing calendar beginning September 15, 1998.